# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# HAMMOND DIVISION AT LAFAYETTE

| | |
|---|---|
| PURDUE RESEARCH FOUNDATION, | ) |
| Plaintiff, | ) |
| v. | ) Cause No. 4:07-cv-74-AS-APR |
| BIOVALVE TECHNOLOGIES, INC., | ) |
| Defendant. | ) |

## OPINION AND ORDER

This matter is before the Court on the Motion for Summary Judgment (Doc. No. 26) and Motion to Strike (Doc. No. 31) filed by Plaintiff Purdue Research Foundation ("PRF" or "Plaintiff"). Defendant BioValve Technologies, Inc. ("BioValve" or "Defendant") responded to the motions, to which PRF replied. Oral argument was heard on these motions in Lafayette, Indiana on December 12, 2008, and careful consideration has been given to the parties' positions.

For the reasons set forth below, PRF's Motion to Strike (Doc. No. 31) is **DENIED** and PRF's Motion for Summary Judgment (Doc. No. 26) is **GRANTED** with the limitation that the amount of damages need yet to be determined.

## I. PROCEDURAL HISTORY

On May 16, 2007, PRF filed suit in Tippecanoe Circuit Court against BioValve for breach of a License Agreement ("License Agreement")[1]. On August 14, 2007, Default Judgment was entered in the amount of $95,728.50, which was set aside on November 5, 2007. BioValve then appeared and removed the case to this Court on November 28, 2007, where jurisdiction exists based on diversity of citizenship. 28 U.S.C. § 1332.

---

1   The License Agreement is attached as Exhibit A to the Complaint, Doc. No. 1-2, and as Exhibit A to the Motion for Summary Judgment, Doc. No. 26-3.

## II. STANDARD OF REVIEW

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In deciding a motion for summary judgment, a court must view all facts in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Nucor Corp. v. Aceros Y Maquilas De Occidente*, 28 F.3d 572, 583 (7th Cir. 1994).

The moving party bears the burden of identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits" that the moving party believes demonstrate an absence of genuine issue of material fact. *Celotex Corp.*, 477 at 323. Once this burden is met, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Becker v. Tenenbaum-Hill Assocs., Inc.*, 914 F.2d 107, 110 (7th Cir. 1990); *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 620 (7th Cir. 1989). "[A] party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact which requires trial." *Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir. 1988). Therefore, if a party fails to establish the existence of an essential element on which the party bears the burden of proof at trial, summary judgment is proper.

## III. FACTUAL BACKGROUND

On July 17, 2001, the University of North Carolina at Chapel Hill ("UNC-CH") and PRF entered into a License Agreement with DarPharma, Inc. BioValve, a pharmaceutical company, became a party to the License Agreement when it acquired DarPharma, Inc. in late 2005. Pursuant to its acquisition of DarPharma, Inc., BioValve took over DarPharma, Inc.'s licensing rights under

the Licensing Agreement. At the time of the acquisition, DarPharma, Inc. owed PRF certain back licensing payments, and therefore BioValve made significant payments to PRF for DarPharma, Inc.'s back debts.

Pursuant to the terms of paragraph 3.3 of the License Agreement, BioValve agreed to pay PRF a license fee in the form of reimbursement of past and future non-reimbursed costs (including attorneys' fees) arising out of the patenting or maintenance of existing patents relating to the inventions pursuant to Article X of the License Agreement. Paragraph 3.3 further provided that reimbursement of patenting costs shall be due upon monthly billings from PRF. Pursuant to paragraph 17 of the License Agreement, BioValve agreed to pay PRF interest at the rate of up to 1.5% per month on the amount of any unpaid balance. PRF claims that between November 1, 2005 and May 1, 2006, neither DarPharma, Inc. nor BioValve, made any payment on the invoices which had been sent to them for fees and charges on the License Agreement.

During the time that the License Agreement was in effect, Mr. Robert Gonnelli, the President and CEO of BioValve, directed PRF to pay the fees regarding certain annuities pursuant to the License Agreement. PRF states that it paid the fees for these annuities at the request of Mr. Gonnelli, and that it would not have paid these fees if it had not been directed to do so.

On March 27, 2006, Deanna Pass, a representative of PRF, spoke to Mr. Gonnelli about PRF's concern that PRF had not received any payments since October 2005. On the same day, Mr. Gonnelli requested Ms. Pass to send the patent reimbursement invoices associated with the License Agreement between PRF and BioValve to Michelle Carter, an employee of BioValve. After receiving copies of the invoices for the balance which was still outstanding and owed to PRF, on or about May 4, 2006, BioValve made a payment to PRF in the sum of $40,464.37 for fees and expenses which were owed. After the payment of $40,464.37, the amount of the balance owing to

PRF on the License Agreement was $35,036.69.

Between June 30, 2006 and January 31, 2007, PRF sent six (6) invoices to BioValve for the costs, fees, charges, and expenses which it had incurred and were due and owing to PRF pursuant to the License Agreement. BioValve did not make any payment to PRF for any of these invoices. Yet, BioValve states that it informed PRF that it would be willing to pay the remaining back invoices, so long as the parties could reach an agreement on issues that BioValve had discovered with regard to their arrangement. Specifically, in reviewing PRF's handling of the licensed materials, BioValve claims that it made two concerning discoveries, as follows:

First, BioValve learned that – contrary to standard procedure in relation to such agreements, and contrary to the terms of the Licensing Agreement itself – PRF had been submitting patent applications for the licensed materials without first consulting BioValve, and then charging BioValve for the significant costs associated with such applications. *See* Licensing Agreement, §10.1. In doing so, BioValve alleges that PRF violated BioValve's "right to advise UNC-CH and PRF as to such prosecution, and further . . .to make reasonable requests as to the conduct of such prosecution," and it imposed on BioValve costs that it might not otherwise have approved.

Second, BioValve learned that PRF was licensing related and directly competing molecules in violation of both the terms and the intent of the Licensing Agreement between the parties. *See* Gonnelli Aff., Doc. No. 6-3. More specifically, BioValve received a call from Mr. Trebley, a representative of PRF, in which he asked if BioValve would be interested in licensing a different molecule, also designed to develop drugs treating schizophrenia. In truth, the molecule being offered was simply a variant of the first molecule which BioValve had already licensed and for which it had been paying the licensing and development costs. BioValve told PRF that it could not license this molecule separately because it would infringe upon BioValve's rights under the existing licensing

agreement, and because it would unfairly compete with the existing molecule that BioValve was licensing.

Because of BioValve's failure to pay PRF the amounts which were due and owing to PRF pursuant to the License Agreement, in August of 2006, PRF sent BioValve a "30 day termination notice" indicating that the "Licensing Agreement will terminate effective October 2, 2006." *See,* Doc. No. 26-5, Exb. K. BioValve claims that even after sending this letter (and after October 2, 2006), PRF continued to incur additional licensing costs and bill the same to BioValve. PRF claims that on December 5, 2006, Mr. Gonnelli sent an e-mail to Joseph Trebley representing that BioValve would "pay everything without any questions." *See,* Doc. No. 26-5, Exb. L. As of January 31, 2007, the outstanding balance, charges, expenses, and interest which BioValve owed PRF pursuant to the License Agreement was $86,253.94.

In February of 2007, PRF representatives Joseph Trebley and Dr. David Nichols, came to Massachusetts to discuss and negotiate the terms of a new agreement. In May of 2007, after another discussion between BioValve and PRF, BioValve contends that the parties had worked out the essential terms of a new agreement which addressed the concerns of both BioValve and PRF. According to Joseph Trebley, PRF had but a few remaining clarifying questions. The parties continued their discussions over the next few weeks and, on or about May 22, 2007, BioValve's Chief Operating Officer, Bruce Andrews, sent Mr. Trebley an email attaching a letter. *See,* Doc. No. 26-5, Exb. M. BioValve claims that the letter outlined the terms agreed to between the parties, but the letter stated that it would "serve as the basis for developing a new agreement" and gave PRF the option to agree to the "*proposed* amendments." *Id.* (emphasis added). BioValve also admitted its outstanding patent expenses: "if you are prepared to sign this letter . . . BioValve will immediately issue a check for payment of half the outstanding patent expenses. The remaining half will be paid

upon completion of the current round of financing expected to be during the third quarter of 2007." *Id*. In response, by e-mail dated May 24, 2007, Mr. Trebley wrote to Mr. Andrews thanking him for his proposal and advising him that "the existing license terminated in 2006 due to nonpayment" and that PRF would not consider any new proposals until "the amount owed to PRF by BioValve is paid in full . . .[and] PRF declines your proposal" *See,* Doc. No. 26-5, Exb. N. PRF's position is that no agreement was reached between PRF and BioValve for a new License Agreement.

At the time PRF filed its complaint on May 16, 2007, PRF claims that BioValve never denied that it was responsible for paying the full amount of the invoices, and that BioValve never claimed that PRF had breached the License Agreement or had failed to comply in any way with the terms of the License Agreement.

Yet, BioValve claims that it has legitimately contested PRF's claimed damages in this matter, including charges in September and October of 2006 which account for more than $21,000 of PRF's claimed damages. BioValve argues that PRF's invoices suggest that it initially sought approximately $75,000 in outstanding licensing fees (including more than $21,000 in fees incurred after PRF's letter purporting to terminate the Licensing Agreement). PRF's claimed damages then climbed to $85,000; then $95,000; and now $114,000. PRF explicitly states that as of August 1, 2008, the total amount of the outstanding balance including costs, fees, charges, and interest which have not been paid by BioValve to PRF on the License Agreement is $114,454.73, plus attorneys' fees and interest.

## IV. ANALYSIS

### A.  **Motion to Strike**

This Court has before it a Motion to Strike filed by PRF (Doc. No. 31). Essentially, PRF seeks to strike portions of BioValve's President and CEO Robert Gonnelli's Affidavit (Doc. No. 6-3, ¶¶ 6, 9, 10) and Supplemental Affidavit (Doc. No. 9-2, ¶ 7) and BioValve's legal counsel Evan Fray-

Witzer's Affidavit (Doc. No. 29-2, ¶ 4), and argues that the statements amount to speculation, conclusory allegations, and/or are not supported by the evidence because BioValve offers none, except the affidavits. In response, BioValve only asserts that the lack of specificity in the affidavits illustrates the need for it to conduct discovery which "may well lead to additional admissible evidence that will demonstrate the existence of genuine issues of material fact." *See,* Doc. No. 36, p. 3.

This case has been pending for twenty (20) months. The request for additional time for further discovery is not well taken, especially in light of the fact that nothing in the record suggests that BioValve is not in breach of the License Agreement— even assuming that BioValve is relieved of some costs and expenses it might have otherwise been obligated to pay. Further, although it seems clear that no subsequent agreement was finalized, whether or not a new agreement was worked out between the parties does not affect the breach or non-breach of the License Agreement at issue here. The statements sought to be stricken merely represent disagreements over the amount of damages that PRF is rightfully entitled, and whether BioValve may be relieved from paying certain amounts to PRF. These statements do not pose a different version of the facts to which this Court determines whether a breach of the License Agreement occurred, thus, the Court has resolved to let the record stand for purposes of summary judgment and **DENIES** Plaintiff's Motion to Strike.

**B.** <u>**Motion for Summary Judgment**</u>

PRF asserts that it is entitled to summary judgment for breach of contract against BioValve, and that it is owed damages in the amount of $114,454.73, plus pre-judgment interest and reasonable attorneys' fees and costs.

BioValve argues that the following genuine issues of material fact exist:

> Whether PRF violated Section 10.1 of the Licensing Agreement, which states "Licensee [BioValve] shall bear the cost of filing and prosecuting U.S. patent applications . . .[and PRF] shall keep Licensee advised as to the prosecution of such application . . .", thus relieving BioValve of its obligation to pay amounts incurred without BioValve's (or DAR's) prior approval or assent;
> Whether, and to what extent, the fees claimed by PRF in this action were properly incurred under the Licensing Agreement;
> Whether PRF's alleged violations of Sections 2.2 and 2.3 of the Licensing Agreement, which grants BioValve "the right to make, use, and sell Licensed Products in the Licensed Field, upon the terms and conditions set forth herein" (but does not restrict PRF's right to license other technologies to other parties), caused BioValve harm which might provide BioValve with a setoff against PRF's claimed damages;
> Whether PRF can claim entitlement to payment for more than $21,000 in licensing fees incurred *after* PRF's purported termination of the Licensing Agreement;
> Whether the parties' agreement in May of 2007 was definite and precise enough to be enforced as a settlement agreement; and
> Whether (and to what extent), Plaintiff can claim what appears to be more than $40,000 in late fees for amounts legitimately disputed by BioValve.

*See*, Doc. No. 29, p. 4-5.

BioValve's alleged genuine issues of material fact are much akin to the statements PRF sought to strike in the affidavits. As mentioned, these issues go to the damage amount, and not to whether a breach of the subject License Agreement occurred. In fact, BioValve does not dispute that it is in breach of the License Agreement due to its failure to pay PRF pursuant to the License Agreement. Instead, it argues that genuine issues of material fact exist based on PRF's wrongdoing. Even assuming PRF violated Sections 2.2, 2.3, and 10.1 of the License Agreement (despite the lack of *any* specifics that PRF actually failed to advise BioValve concerning the prosecution of any patent applications, and the lack of *any* facts suggesting that PRF licensed competing technologies to another party or violated the exclusive license), BioValve has not shown that such violations would

8

relieve it of its duty to abide by the terms of the License Agreement to make certain licensing payments. Whether BioValve is entitled to a set-off, or is not obligated to pay certain fees and damages claimed by PRF, concerns the amount of damages, and does not affect the determination that BioValve is in breach of the License Agreement. No one questions the validity of the License Agreement, and with no factual dispute of record that BioValve is in breach causing PRF damages, summary judgment is appropriate. *See*, *Indiana Bureau of Motor Vehicles v. Ash*, 895 N.E.2d 359, 365 (Ind.App. 2008) (the essential elements of a breach of contract action are the existence of a contract, the defendant's breach thereof, and damages). Therefore, summary judgment in favor of PRF is proper, with the damage amount to be determined by an evidentiary hearing. *See St. Vincent Hosp. and Health Care Center, Inc. v. Steele*, 766 N.E.2d 699 (Ind. 2002) (affirming trial court's entry of summary judgment on plaintiff's breach of contract claim and holding a series of hearings on damages).

## V. CONCLUSION

Viewing the record in the light most favorable to the non-movant, the uncontested facts reveal that BioValve is in breach of the License Agreement with PRF, and no jury could find otherwise.

Based on the foregoing, PRF's Motion for Summary Judgment (Doc. No. 26) is **GRANTED** with the limitation that the amount of damages need to be determined, and PRF's Motion to Strike (Doc. No. 31) is **DENIED**. This case is set for an evidentiary hearing on the issue of damages on **March 16, 2009 at 9:30 a.m. (EST)** in the second floor courtroom of the Federal Building in LAFAYETTE, Indiana.

    **SO ORDERED.**

    **DATED: January 23, 2009**

/s/ ALLEN SHARP
**ALLEN SHARP, JUDGE**
**UNITED STATES DISTRICT COURT**